

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

ALK/RCC  *271 Cadman Plaza East*
F. #2020R00471  *Brooklyn, New York 11201*

April 2, 2025

By ECF

The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. John Waldrop
      Criminal Docket 23-378 (RPK)

Dear Judge Kovner:

  The government respectfully submits this letter in response to defendant John Waldrop's sentencing submission, ECF No. 38, and in advance of his sentencing, which is scheduled for April 9, 2025, at 2:00 p.m. For the reasons below and in accordance with the plea agreement, the government does not oppose the defendant's request for a non-incarceratory sentence and recommends the Court impose a sentence of three years' probation, a $900,000 fine, and $110 special assessment.

  I. Procedural History

  The U.S. Fish and Wildlife Service ("USFWS") began an investigation after intercepting a series of packages at John F. Kennedy International Airport containing high-quality taxidermy bird mounts of protected species. The investigation led to the September 19, 2023, indictment of the defendant and co-defendant Toney Jones on charges of conspiracy, smuggling goods into the United States, the Endangered Species Act (the "ESA"), and a money laundering conspiracy. On August 12, 2024, the defendant pleaded guilty, pursuant to a plea agreement, to conspiracy and ESA violations.

  II. Guidelines Calculation and Plea Agreement Terms

    a. Enhancement as an Organizer of Criminal Activity

  The government concurs with the United States Sentencing Guidelines calculation set forth in the draft Presentence Investigation Report dated February 5, 2025 ("PSR") and the March 28, 2025, PSR Addendum, which calculates a total adjusted offense level of 21 and a criminal history category of one, resulting in a Guidelines range of 37 to 46 months. PSR ¶¶ 46, 49, 88.

The defendant objects to the inclusion of a two-level enhancement under Guideline § 3B1.1(c) for acting as an organizer of the criminal activity. ECF No. 38 n.1. As explained below, the Court should reject the defendant's arguments.

The sentencing guidelines call for a two-point enhancement if the "defendant was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). The defendant was the organizer of the conspiracy to obtain bird mounts and preserved eggs for his personal collection. Initially he purchased and imported wildlife on his own, using his personal address, email account, and payment methods. But once USFWS and customs authorities began seizing items with regularity, in 2016 he pivoted by recruiting co-defendant Jones.

The defendant employed Jones as a caretaker on his Georgia farm. He directed Jones to receive packages of illegally-imported birds that were in fact for the defendant's collection. He and Jones conspired to deposit approximately $525,000 in Jones's bank account that would fund a PayPal account to disguise that the defendant was the one paying for the wildlife. The cash flow between the defendant and Jones is reflected in the graph below:



The defendant and Jones were successful until authorities began intercepting the packages heading to Jones. The defendant then turned to Jones's brother, who also worked for the defendant as a groundskeeper, to receive shipments. The defendant also directed Jones's brother to make multiple trips to meet a contact in Pennsylvania to retrieve birds and display cases.

The defendant purchased an antique bird mount from the individual in Pennsylvania, who specialized in selling Hollywood memorabilia. The individual was originally from Europe and agreed to import wildlife for the defendant from European distributors. This allowed the defendant to again hide his identity and direct the individual on the species, price, and quantity of the imports.

The defendant had a similar relationship with a wildlife importer in Missouri who helped obtain illegally-imported birds.

Finally, the defendant was an organizer in how he coordinated with suppliers in Africa, Europe, and South America. While he often purchased items they listed for sale, he also directed them on what species he was looking to obtain. For example, he inquired whether a South American supplier could obtain an endangered quetzal bird for him and offered to fund an Icelandic egg poacher's trip. In May 2020, the defendant communicated with a European taxidermist who was in contact with an African supplier. The defendant asked if a Beaudouin's snake eagle, protected in the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") Appendix II, was "fresh" and as seen below, placed a yellow check mark on the one he wished taxidermized.



The defendant was more than just a buyer. He acted as a leader to Jones, his brother, the middlemen, and suppliers to build his collection. Therefore, the Court should apply a two-level enhancement as recommended by the PSR. PSR ¶¶ 28, 40, 42, and 46; PSR Addendum at 2-3.

    b.   <u>Joint Recommendation for a $900,000 Fine</u>

In accordance with the plea agreement, the government and the defendant jointly recommend that the Court impose a $900,000 fine, the agreed upon pecuniary gain to the defendant, on the ESA count as part of the sentence. Pursuant to 34 U.S.C. § 20101(b)(1)(A) (formerly 42 U.S.C. § 1060(b)(1)(A)), any fine imposed will be paid by the clerk into the Cooperative Endangered Species Conservation Fund, also known as the Lacey Act or ESA reward fund. 16 U.S.C. § 3375(d). The clerk may transmit the funds to the USFWS Cost Accounting Section, P.O. Box 272065, Denver, CO 80227-9060.

The PSR and Addendum detail the defendant's financial condition, though it is unclear if the Department of Probation is still missing select financial statements. PSR Addendum at 7. Regardless, the draft PSR determined the defendant had the ability to pay the recommended $900,000 fine. PSR ¶ 86. The proposed payment rate of 10 percent of monthly income is not appropriate, as it could take more than 20 years for the defendant to pay the full amount.

The defendant entered his guilty plea in August 2024 and has had ample time to make financial plans in the event that the Court adopts the parties' recommendation. The government therefore proposes that if the Court imposes a $900,000 fine, that the defendant pay $450,000 by May 1, 2025, and $450,000 by August 1, 2025, as a condition of probation.

Finally, the defendant agreed in the plea agreement to abandon all of his bird mounts and eggs that USFWS seized during a search warrant or that he still possessed. The defendant has fulfilled this obligation, so it is not necessary that it be included as a condition of probation.

### III. Discussion of Sentencing Factors

Section 3553(a) requires sentencing courts to consider a number of factors in imposing sentence, including the nature and circumstances of the violation and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, promote respect for the law, and provide just punishment; the need for the sentence to adequately deter criminal conduct; the need to protect the public from further crimes of the defendant; and the need to provide the defendant with needed education, vocational training, medical care and/or other correctional treatment in the most effective manner. Sentencing courts must also consider the kinds of sentences available, the applicable Guidelines and pertinent policy statements, and the need to avoid unwarranted sentencing disparities.

#### a. History and Characteristics of the Defendant

The government acknowledges the defendant's contributions to his community as a physician and father. He also faces serious medical issues, leading to the government's non-opposition to a probationary sentence. But he revealed aspects of his character through his actions that warrant the recommended sentence.

The defendant persisted in his pursuit of illegal wildlife despite numerous interactions with authorities. He had previously imported hunting trophies lawfully, so he was aware of the declaration and permit requirements. He received a 2007 citation for not declaring an elephant ivory bracelet and two 2016 citations relating to taxidermy birds. He coordinated with suppliers on how to package wildlife to avoid detection. Authorities confiscated many of his imports, yet he continued to place his desire for an extensive avian collection above the law.

Most significant is how the defendant brought Jones and his brother into the criminal scheme. The evidence is clear that neither Jones nor his brother would have been involved with wildlife trafficking but for the defendant's requests. Of course they are responsible for their own actions, but the defendant was intent on concealing his identity and to continue smuggling birds at their expense.

b.  Nature and Circumstances of the Offense

The breadth of the defendant's collection was extraordinary, containing 1,401 taxidermy mounts[1] and 2,594 eggs. While some of the items had permits, the vast majority did not have documentation about their origin as required for any import; none of the imports observed by authorities in 2016 to 2020 complied with the law. Below are examples of the bird and egg collection seen during the search warrant.



---

[1] The attached laboratory report references 1,390 mounts because one box containing 11 birds was not initially analyzed due to a snowstorm.

5



Ornithologists at the USFWS forensic laboratory determined that this investigation was the "largest seizure of bird mounts we have seen in the 37-year history" of the lab.[2] Their report is included as Exhibit 1. Included in the collection were four eagles protected by the Bald and Golden Eagle Protection Act, 179 bird and 193 egg species protected by the Migratory Bird Treaty Act ("MBTA"), and 212 bird species and 32 egg species listed under CITES. The scientists noted some incredibly rare species in the defendant's collection. For example, he had a swift parrot (*Lathamus discolor*), which is native to Australia and estimated to only have 1,000 to 2,499 population in the wild. He also had three Nordmann's Greenshank (*Tringa guttifer*) eggs, an Asian shorebird with 900 to 1,600 remaining population. No museum in North America has these eggs in its collection, yet the defendant obtained three of them. *Id*.

The laboratory detailed some of the specific impacts of the defendant's collection on conservation and biodiversity:

- The wildlife trade is a major driver of the ongoing biodiversity crisis which impacts species, ecosystems, and humanity.
- Birds are the most traded vertebrate group. As the top importer of wildlife products, the U.S. plays a critical role in wildlife exploitation, conservation, and the mitigation of illegal activities, such as Waldrop's.

---

[2] "Mounts and Eggs Summary," J. Terrill & A. Woodward, USFWS National Fish and Wildlife Forensic Lab (March 14, 2025).

- The majority of the taxidermy mounts are raptors (hawks, eagles, vultures, falcons, and owls) which are long lived, slow to reproduce, and are long persecuted and therefore are of significant conservation concern.
- Waldrop's possession of 1,390 taxidermy bird mounts and 2,594 eggs highlights the severity of the ongoing global illegal trade of wildlife especially in the United States.

There is not any evidence that the defendant killed any of the wildlife involved in this case. But by purchasing them, he created the demand that fueled poaching and wildlife trafficking. He also exacerbated pressure on species by targeting animals in their prime that are needed to reproduce and maintain their habitat. "When endangered species are involved, any poaching or harvesting of that species to supply the illegal trade risks the species becoming extinct. Further worsening the problem is the fact that the demand for larger and more ornate specimens means that hunters and collectors often aim for the fittest individuals from the breeding population, with serious consequences for subsequent generations."[3] The defendant communicated with suppliers by email for specific bird species and then agents found mounts of the same species in his collection. Two examples are shown below: a Roseate spoonbill (listed in the MBTA) and African fish eagle (CITES Appendix II).



---

[3] "Implications of Wildlife Trafficking," U.N. Office on Drugs and Crime (Sept. 2019).



Finally, the defendant's smuggling frustrated the regulatory scheme meant to protect and monitor these species. The declarations and permits are necessary so authorities can verify imports, track the movement of species, screen them for pests, and ensure that they came from sustainable populations for bona fide purposes such as zoos, museums, or universities.

    c. <u>Deterrence</u>

The Court's sentence should reflect the scope and seriousness of this offense, and the need to promote respect for the law. Three years of probation and a $900,000 fine is sufficient, but not greater than necessary, to deter the defendant and general public who would seek to violate wildlife and import laws for personal gain or enjoyment. This includes deterring those who would exploit New York's ports to bring illegal wildlife into the United States. In this case, the Court has the opportunity to sentence the individual who was directly responsible and had benefited from wildlife trafficking. "[I]t is rarely the trade coordinator that is held accountable. Historically it has been the low-level couriers who are apprehended, and prosecutions are uncommon, which provides little meaningful deterrent or impact on the proliferation of the trade itself."[4]

---

    [4] "Operation Dragon: Revealing new evidence of the scale of corruption and trafficking in the turtle and tortoise trade," S. Stoner. *Wildlife Justice Commission* (December 2018).

IV.     Conclusion

For the foregoing reasons, the Court should sentence the defendant to three years' probation, a $900,000 fine to be paid in installments as proposed herein, and $110 special assessment.

                                            Respectfully submitted,

                                            JOHN J. DURHAM
                                            United States Attorney

By:     /s/
       Anna L. Karamigios
       Assistant U.S. Attorney
       Eastern District of New York
       (718) 254-7000

By:     /s/
       Ryan C. Connors
       Senior Trial Attorney
       U.S. Department of Justice
       Environmental Crimes Section
       (718) 254-7000

cc:    Clerk of Court (RPK)
       Counsel for defendant (via ECF)